# EXHIBIT R

**AMERICAN BAR ASSOCIATION**

**ADOPTED BY THE HOUSE OF DELEGATES**

**AUGUST 3-4, 2020**

<u>**RESOLUTION**</u>

RESOLVED, That the American Bar Association adopts the *American Bar Association Best Practices for Third-Party Litigation Funding* dated August 2020.

**AMERICAN BAR ASSOCIATION**
**BEST PRACTICES FOR**
**THIRD-PARTY LITIGATION FUNDING**
**AUGUST 2020**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION ................................................................ 1

II.   BASICS – WHAT IS THIRD-PARTY LITIGATION FUNDING? ...................... 2

III.  TYPES ....................................................................... 4

      A.   Direct Lawyer-Funder Arrangements and Considerations ................ 4

           1.   Fee Splitting ............................................... 4

           2.   Referral Fees ............................................... 5

           3.   Disclosure of Client's Confidential Information to Funder ......... 5

           4.   Potential Conflicts ......................................... 6

           5.   Loans ....................................................... 6

           6.   Class Actions ............................................... 6

      B.   Client-Funder Arrangements ......................................... 7

           1.   Living Support for Unsophisticated Litigants ................ 7

           2.   Investing in Commercial Litigation: Sophisticated Client, Single Big Case ................................................... 7

           3.   Portfolio Funding ........................................... 8

           4.   Not Motivated by Profit:  Cause-Based Funding ................ 8

           5.   Revenge Funding ............................................. 9

           6.   Respondent-/Defendant-Side Funding .......................... 9

           7.   Third-Party Funding in International Arbitration ............ 10

IV.    BEST PRACTICES ............................................................................ 10

    A.    Disclosure ........................................................................... 11

    B.    Documentation and Structure .............................................. 12

    C.    Professional Responsibility .................................................. 15

    D.    Privilege and Work Product ................................................. 17

V.    ADDITIONAL CONSIDERATIONS FOR SPECIAL TYPES OF FUNDING .. 19

    A.    Funding for Unsophisticated Litigants ................................. 19

    B.    Class Actions ...................................................................... 19

    C.    Portfolio Funding ................................................................ 20

    D.    Funding Not Motivated by Profit ......................................... 20

    E.    Revenge Litigation Funding ................................................ 21

    F.    Respondent/Defendant Side Funding .................................. 21

    G.    Third-Party Funding in International Arbitration ................... 21

VI.    CONCLUSION ............................................................................... 22

## <u>SELECTED REFERENCES</u>

ABA Formal Opinion 484, *A Lawyer's Obligation When Clients Use Companies or Brokers to Finance the Lawyer's Fee* (November 27, 2018)

ABA Model Rule of Professional Conduct 1.6

ABA Model Rule of Professional Conduct 1.7(a)(2)

ABA Model Rule of Professional Conduct 1.8(a)

ABA Model Rule of Professional Conduct 1.8(e)

ABA Model Rule of Professional Conduct 1.8(f)

ABA Model Rule of Professional Conduct 1.8(i)

ABA Model Rule of Professional Conduct 5.4(a)

ABA Model Rule of Professional Conduct 5.4(c)

Agee, Charles III, Lucian Pera, Steven Vickery, *Litigation Funding and Confidentiality: A Compromise Analysis of Current Caselaw* (Westfleet Advisers, revised June 10, 2019) (available at https://westfleetadvisers.com/wp-content/uploads/2019/08/2019 June_Westfleet_LitigationBooklet1.pdf )

American Bar Association, *Commission on Ethics 20/20 White Paper on Alternative Litigation Finance Informational Report to the House of Delegates* (2012)

Avraham, Ronen & Anthony Sebok, *An Empirical Investigation of Third Party Consumer-Litigation Funding*, 104 Cornell L. Rev. 1133 (2018)

Chipi*, Nicole, Eat Your Vitamins and Say Your Prayers: Bollea v. Gawker, Revenge Litigation Funding, and the Fate of the Fourth Estate*, 72 U. Miami L. Rev 269 (2017)

Gallagher, David, *Litigation Funding: What Are the Benefits for Solo Practitioners and Small Firms*, American Bar Association (January 25, 2017) (available at https://www.americanbar.org/groups/litigation/ committees/solo-small-firm/articles/ 2017/litigation-funding-what-are-benefits-solo-practicioners-small-firms/)

Gupta, Suneel, *Litigation Funding and Product Liability Lawsuits,* submitted for Georgia's 26th Annual Products Liability Seminar (2018)

Herschkopf, Jayme, *Third-Party Litigation Finance* (Federal Judicial Center 2017) (available at https://www.fjc.gov/sites/ default/files/materials/34/Third-Party_ Litigation_ Finance.pdf) (FJC Pocket Guide)

http://disputeresolutionblog.practicallaw.com/litigation-funding-and-insurance-for-defendants-a-lesser-trodden-path

**111A**

https://abovethelaw.com/2017/03/litigation-finance-for-defendants/

https://www.law        360.com/articles/429993/litigation-finance-co-launches-with-defense-side-focus

Int'l Council for Commerical Arbirtation, *Report of the ICCA-Queen Mary Task Force on Third-Party Funding in International Arbitration* (April, 2018)

Lindeman, Ralph, *"Third-Party Investors Offer New Funding Source for Major Commercial Lawsuits,"* (BNA: Daily Reports for Executives, Vol. 0, No. 42, March 5, 2010)

New York City Bar Op 2018 – 5, *Litigation Funders' Contingent Interest in Legal Fees* (July 30, 2018)

New York State Bar Ass'n Ethics Op. 1145, *Litigation financing; conflicts of interest* (March 7, 2018)

Perry, Ronen, *Crowdfunding Civil Justice*, 59 Boston College L. Rev., 1357 (2018)

Pitkowitz, Nikolaus, ed., *Handbook on Third-Party Funding in International Arbitration* (Juris Legal Information 2018)

Samra, Emily, *"The Business of Defense: Defense-Side Litigation Financing,"* 83 University of Chicago L. Rev., pp. 2299-2341 (2016)

Williams, Onika, *Fee Financing Sails Into Uncharted Waters*, 44 Litigation News, pp. 10-13 (ABA Section of Litigation *Spring* 2019)

## <u>ILLUSTRATIVE CASES</u>

*Acceleration Bay LLC v. Activision Blizzard*, 2018 WL 798731 (D. Del. Feb. 9, 2018)

*Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*, 27 N.Y. 3d 616 (2016)

*Charge Injection Technologies, Inc. v. E.I. DuPont de Nemours & Co.*, 2015 Del. Super. LEXIS 166 (Del. Super. Ct. March 31, 2015)

*Estate of McPherson ex rel. Liebreich v. Church of Scientology Flag Service Organization, Inc.*, 815 So.2d 678 (Fla. 2d DCA 2002)

*Gbarabe v. Chevron Corp.*, 2016 WL 4154849 (N.D. Cal. 2016)

*In re Gilman's Administratrix*, 167 N.E. 437 (N.Y. 1929)

*In re Valsartan N-Nitrosodimethylamine (NDMA) Contamination Prods Liab. Litig.*, 2019 U.S. Dist. LEXIS 160051, 2019 WL 4485702, Civ. No. 19-2875 (RBK/JS) (D.N.J. Sept. 19, 2019)

*Kaplan v. S.A.C. Capital Advisors, L.P.*, 2015 WL 5730101 (S.D.N.Y. 2015)

*Maslowski v. Prospect Funding Partners LLC, et al.*, 2019 Minn. App. Unpub. LEXIS 644, 2019 WL 3000747, No. A18-1906 (Minn. Ct. App. July 8, 2019)

*Matthews v. City of Maitland*, 923 So. 2d 591 (Fla. Dist. Ct. App. 2006)

*Miller UK v. Caterpillar*, 17 F. Supp. 3d 711 (N.D. Ill. 2014)

*MLC Intellectual Property, LLC v. Micron Technology, Inc.*, 2019 WL 11859 (N.D. Ca. Jan. 7, 2019)

*Money Max Int. Pty Ltd. (Trustee) v. QBE Ins. Group*, FCAFC 148 (October 26, 2016)

*National Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415 (1963)

*Ruth v. Cherokee Funding,* 304 Ga. 574, 820 S.E.2d 704 (2018)

*Schlaeffler v. United States*, 806 F.3d 34 (2d Cir. 2015)

*Tradeline Enterprises Pvt., Ltd v. Jess Smith & Sons Cotton, LLC, et al.*, Case No: 2:15-cv-08048 JAK (C.D. Cal. 2018)

*United States v. Hammatt,* Case No. 1:19-cr-00067 (S.D.N.Y. 2019)

*United States v. Homeward Residential, Inc.*, 2016 WL 1031154 (E.D. Tex. 2016)

**111A**

*White Lilly LLC, et al. v. Balestriere* PLLC, Case No. 1:18-cv-12404 (S.D.N.Y. Jan. 2, 2019)

*Xerox Corp. v. Google, Inc.*, 801 F. Supp. 2d 293 (D. Del. 2011)

**AMERICAN BAR ASSOCIATION**
**BEST PRACTICES FOR**
**THIRD-PARTY LITIGATION FUNDING**
**AUGUST 2020**

## I.   INTRODUCTION

The *American Bar Association Best Practices for Third-Party Litigation Funding* ("Best Practices") are written to assist lawyers considering litigation funding – whether to provide legal fees for sophisticated, cross-border arbitration and litigation, to assist an individual plaintiff or claimant in a personal injury lawsuit or worker's compensation claim, or any other litigation or arbitration context.

The American Bar Association first addressed third-party litigation funding in 2012 when the House of Delegates adopted the *Commission on Ethics 20/20 White Paper on Alternative Litigation Finance Informational Report to the House of Delegates* (hereinafter "20/20 Report").   This work predates the exponential growth in third-party litigation funding, but still provides an important foundation for Best Practices.

The term "litigation funding" covers a broad range.  Sections II and III set forth the basics and then describe various types of funding.  Suggested Best Practices applicable to all types of litigation funding follow in Section IV, and Section V provides additional considerations for particular types of funding.  They range from cases where clients obtain the funds – perhaps with assistance from their lawyer – to situations where the lawyer initiates and negotiates the funding arrangement.

In this evolving area, these Best Practices should not be read as recommended standards of professional conduct or as a basis for attorney discipline.  The phrase "Best Practices" is used as a shorthand for issues that should be considered before entering into a litigation funding arrangement.  Jurisdictions where the attorney practices may have standards that differ (perhaps materially) from these Best Practices, and those standards may establish standards of care or grounds for discipline.

The Best Practices do not take a position on a number of litigation funding issues – for example, whether litigation funding should be permitted, as a matter of law or legal ethics, in any particular jurisdiction or in any particular context; or whether, when and in how much detail a funding arrangement need be disclosed.[1]  On the issue of disclosure,

---

[1] For a quick comparison of some varying results regarding court-required disclosure, compare *Charge Injection Technologies, Inc. v. E.I. DuPont de Nemours & Co.*, 2015 Del. Super. LEXIS 166 at *12-13 (Del. Super. Ct. March 31, 2015) (protecting "finance agreement" as work product) and *Xerox Corp. v. Google, Inc.*, 801 F. Supp. 2d 293, 303-04 (D. Del. 2011) (applying common interest coverage of attorney-client privilege to find no waiver when documents shared with funder), with *Acceleration Bay LLC v. Activision Blizzard, Inc.*, 2018 WL 798731 (D. Del. Feb. 9, 2018) (documents "prepared with a 'primary' purpose of obtaining a loan, as opposed to aiding in possible future litigation," not protected as work product; also finding no common interest exception to waiver of attorney-client privilege, and noting as significant that communications and documents at issue were exchanged before written agreement was entered into for litigation funding) and *Miller UK v. Caterpillar*, 17 F. Supp. 3d 711, 732-33 (N.D. Ill. 2014) (finding lack of "common legal interest" between funder and party; shared financial interest was inadequate, so attorney-client privilege was deemed waived).

the Best Practices suggest that the practitioner should assume that some level of disclosure may be required at some point – whether by court rules or standing orders, arbitral rules, discovery rulings, or events and proceedings extraneous to the "main event" litigation. This assumption is not meant to indicate a preference, let alone a conclusion, regarding if, when, how, or in how much detail any disclosure should take place. Rather, the goal of these Best Practices is to alert the practitioner to the questions and decisions that should be addressed when considering funding arrangements.

Similarly, the Best Practices do not focus upon the underwriting practices of the funder, as the focus here is on the lawyer and client. Underwriting is mentioned only in connection with pressures that may be exerted on the lawyer to generate additional documentation and the need for the lawyer to exercise caution in the event that disclosure is ultimately ordered in jurisdictions where work product and attorney-client privilege protections are not afforded (or are deemed waived) as to such analyses.

With these disclaimers, some suggested Best Practices are common to all types of funding. *First*, any litigation funding arrangement should be in writing. *Second*, the litigation funding arrangement should assure that the client remains in control of the case. *Third*, the written document should address what happens to the funding arrangement if, down the road, the client and the funder disagree on litigation strategy or goals. *Finally*, because the propriety and the discoverability of litigation funding arrangements are unsettled questions in many jurisdictions (and may differ across contexts within those jurisdictions), the Best Practices advise that attorneys negotiating funding agreements do so with an eye to the likelihood that the "deal documents" for the funding arrangement will be examined by readers whose interests are not fully congruent with those of the lawyer and client.

## II.   BASICS – WHAT IS THIRD-PARTY LITIGATION FUNDING?

"Third-party litigation finance is contracting, as a litigant, to obtain financial assistance from third-party funders in exchange for an interest in the potential recovery. Put simply, a third-party investor helps to finance a lawsuit. The agreement is usually non-recourse, so if the plaintiff loses the case, the funder receives nothing." Jayme Herschkopf, *Third Party Litigation Finance* (Federal Judicial Center 2017) (hereinafter "*FJC Pocket Guide*") at 1. A single narrow definition, however, cannot encompass the range of funding activities that may arise.

---

For a collection of cases across jurisdictions addressing these matters as of early 2019, see the cases cited at pages 23-39 of Charles Agee, III, Lucian Pera, Steven Vickery, *Litigation Funding and Confidentiality: A Compromise Analysis of Current Caselaw* (Westfleet Advisors, revised June 10, 2019) (hereinafter "*Compromise Analysis*"). Similar analyses are likely available from other sources, but the cases listed by Agee, Pera, and Vickery provide a solid start. *See also, e.g., In re Valsartan N-Nitrosodimethylamine (NDMA) Contamination Prods Liab. Litig.*, 2019 U.S. Dist. LEXIS 160051, 2019 WL 4485702, Civ. No. 19-2875 (RBK/JS) (D.N.J. Sept. 19, 2019) (rejecting early disclosure of litigation funding of plaintiffs in M.D.L. based on relevancy and proportionality considerations, but noting split in courts and indicating disclosure would be required if there were a showing that non-party was controlling litigation or settlement discussions).

"Third-party litigation funding refers to funding methods that employ resources from insurance markets, capital markets, or a private fund in lieu of a litigant's own funds." Nicole K. Chipi, *Eat Your Vitamins and Say Your Prayers: Bollea v. Gawker, Revenge Litigation Funding, and the Fate of the Fourth Estate*, 72 U. Miami L. Rev. 269 (2017) (hereinafter "*Eat Your Vitamins*").  Funding may also be supplied by foundations, non-profit organizations or others having a non-financial interest in the outcome.

"Litigation funding" typically is structured as an investment by a funder on a non-recourse basis in a lawsuit or arbitration in exchange for an agreed return from the proceeds, or, in the case of funding of defendants, some other way of compensating the funder based upon the results of the lawsuit.  The funds may be provided to a lawyer – including for a single case, a class action, or a portfolio of cases – or to the litigant.  Direct funding to a litigant for living expenses may be structured as a loan or as an investment, which can make a difference as to its legality under local law.  *See, e.g.*, *Ruth v. Cherokee Funding*, 304 Ga. 574, 820 S.E.2d 704 (2018) (money advanced to litigant for living expenses as a non-recourse investment held not subject to state law usury cap, while characterization as "loan" would likely have rendered terms usurious).

Funding is a form of distributing risk.  Contingent fee arrangements distribute risk between the lawyer and client.  In some jurisdictions, lawyers are allowed to advance sums to the client that may be unrelated to the lawsuit (living expense loans) and that may be non-recourse.  Lawsuits have been funded by family members and businesses unrelated to the lawsuit as well. Outside funding is not new but does have different funders.

Third-party funding is one of many alternative sources of funding for disputes.  Other models include: insurance (one of the oldest models), traditional loans, corporate financing, equity-based and inter-corporate funding, and attorneys as funders (when engaged to act on a full or partial contingency fee basis, or in other alternative fee arrangements, reduced hourly rates, capped fees, or pro bono lawyering).  *See* Int'l Council for Commercial Arbitration*, Report of the ICCA-Queen Mary Task Force on Third-Party Funding in International Arbitration* (April, 2018) (hereinafter "*ICCA Report*"), at 35-37, 46.

The frequency of funding, the diversity of types of funding, and the number of funders have increased.  "The funding market has expanded in several respects.  The number of funded cases has increased significantly.  The number and geographic diversity of third-party funders has also increased, with new entities continuing to enter the market and consequently increase the aggregate amounts available for funding. . . . Perhaps most importantly, the forms of dispute financing have expanded significantly, raising challenging questions about how 'third-party funder' or 'third-party funding' should be defined."  *Id.*

**111A**

### III.   TYPES

In general, plaintiff-side litigation funding consists of a non-recourse investment or loan to either the lawyer (a "Lawyer-Funder" arrangement) or the client (a "Client-Funder" arrangement), with the repayment coming from the litigation recovery.  In defendant-side funding, repayment typically depends on the defendant achieving some agreed-upon benchmark in the adjudication or settlement of the case.

"The [Alternative Legal Finance] market ('ALF') is apparently fairly strongly differentiated."  *20/20 Report*.  The years since 2012 (when the 20/20 Report was adopted by the ABA House of Delegates) have seen increased differentiation.

"A large number of ALF suppliers serve the consumer sector, marketing to personal-injury plaintiffs, and to other individual clients with relatively small legal claims. Consumer ALF suppliers are distinguishable from settlement factoring companies; the former take a partial assignment in a claim that has not yet been settled or reduced to judgment, while the latter purchases a claim that has been reduced to judgment, typically as a result of a judicially approved settlement.  A considerably smaller number of entities fund large, complex commercial litigation.   These companies conduct extensive due diligence on individual cases and make sizeable financial investments.   Finally, commercial lenders and some specialized ALF companies make loans directly to lawyers, as opposed to purchasing claims or parts of claims from clients."  *Id*.

### A.   Direct Lawyer-Funder Arrangements and Considerations

Some litigation funding arrangements involve only the lawyer/law firm and the funder.  In effect, the funder invests directly with the lawyer.  This type of funding can involve arrangements across a portfolio of cases handled by the law firm (portfolio funding),[2] a large single case, or a class action.  The following issues may arise in direct lawyer-funder arrangements.

#### 1.   Fee Splitting

If payment is expected to come from the lawyer's share of the recovery (via contingency or from an express fee award), then local law and ethics rules regarding "fee splitting" with a non-lawyer (the funder) should carefully be examined.  A New York City Bar Opinion has found this type of arrangement to constitute impermissible fee splitting. New York City Bar Op 2018-5, *Litigation Funders' Contingent Interest in Legal Fees* (hereinafter "*NYC Bar Op. 2018-5*").   "[T]he fee-sharing rule forbids two alternative arrangements – first, where an entity's funding is not secured other than by the lawyer's fee in one or more lawsuits, so that it is implicit that the lawyer will pay the funder only if the lawyer receives legal fees in the matter or matters; and second, where a lawyer and funder agree, whether in a recourse or non-recourse arrangement, that instead of a fixed amount or fixed rate of interest, the amount of the funder's payment will depend on the amount of the lawyer's fees – for example, where the agreement sets a payment rate on

---

[2]  *See* p. 12 *infra* for a more detailed discussion of portfolio funding.

a sliding scale based on the total legal fees or total recovery in the case or portfolio of cases." *Id.*

Positions on fee splitting, however, are far from unanimous; the New York City Bar Opinion is not the "law of the land" outside of its reach, nor are opinions or approaches that contradict the New York City Bar Opinion. This is a developing area.

Opponents of the New York City Bar view have generally taken two approaches. The first is to amend the jurisdiction's version of Model Rule of Professional Conduct 5.4(a), upon which New York City Bar Opinion 2018-5 is based, to provide that sharing fees with a funder is not covered by the Rule so long as the lawyer remains independent and the client remains in charge of the lawsuit. This approach is being examined in New York and other jurisdictions. The second, in jurisdictions not covered by the New York City Bar Opinion, posits that the source of the payment should not be the key factor, but must focus upon "independence," and not the flow of funds. David Gallagher, an investment manager for a litigation funder, who was quoted in a 2017 article for the ABA Section of Litigation Solo and Small Practice Committee, provides an example of this type of approach: "[l]itigation funding arrangements with law firms do not violate the rule against fee-splitting, provided that the arrangements do not compromise the attorneys' exercise of independent professional judgment, the protection of which is the underlying purpose of the rule. . . . Two key features of ethically permissible law firm funding arrangements that help to protect the attorneys' exercise of independent professional judgment are the following: 1) an express provision that the funder has no right to control litigation strategy or settlement decisions, and 2) the inclusion of multiple matters in the funded portfolio—typically three or more—to ensure that the funder's investment return will not be tied to any particular client matter." D. Gallagher, *Litigation Funding: What Are the Benefits for Solo Practitioners and Small Firms,* American Bar Association (January 25, 2017) ("*Small Firm/Solo Benefits*"). The jury is still out over which type of analysis will become, or even is, the majority rule.

### 2.   <u>Referral Fees</u>

Irrespective of the analytical approaches to fee splitting, referral fees should not be paid by attorneys to funders. "Attorneys should not offer, and funders should not accept, referral fees from attorneys." *Id.* Likewise, attorneys should not accept referral fees from funders.

### 3.   <u>Disclosure of Client's Confidential Information to Funder</u>

Typically, funders will want access to case information to evaluate whether to make in investment. "No attorney should disclose confidential client information to a litigation funder without client consent. In order for that consent to be informed, the attorney should advise the client of the risk that a disclosure to a funder might be deemed a waiver of the attorney-client privilege." *Id.* As discussed below, while the current trend in the case law favors continuing to protect material disclosed to funders (generally as work product), the cases are not uniform. For a sampling of cases, *see Compromise Analysis*, pages 23-39.

### 4.    Potential Conflicts

When portfolio financing is involved, the possibility of tensions, and even concrete conflicts of interest, may arise if the lawyer or a single client begins to have difficulties with the funder involving one of a group of matters.  "It may even be that the law firm relies upon the funder for financing across a portfolio of matters, which can make it more difficult to avoid or manage perceived conflicts of interest where a disagreement arises between the funder and one of the funded clients in the portfolio."  *ICCA Report.*

### 5.    Loans

"Commercial lenders and some specialized ALF suppliers provide loans or lines of credit directly to law firms.  These loans are typically secured by assets of the firm, such as furniture and fixtures, the firm's accounts receivable, or the firm's contingent interests in ongoing cases."  *20/20 Report.*   "[T]he fee-sharing rule does not forbid a traditional recourse loan requiring the lawyer to repay the loan at a fixed rate of interest without regard to the outcome of, or the lawyer's receipt of a fee in, any particular lawsuit or lawsuits.  That is the case regardless of whether the loan is secured by some kind of collateral."  *NYC Bar Op. 2018-5.*

### 6.    Class Actions

Because of the special role of the court in a class action, these types of cases are unique.  In the class action context, while the lead class lawyer is expected to be experienced and sophisticated, the client may or may not be sophisticated.  Interviews with funders have indicated that their primary focus is on the lawyer and his or her ability and willingness to move the case forward, as opposed to an analysis of the putative representative's "staying power" or even a detailed assessment of the facts underlying the claim.  The willingness of an attorney respected by the funder to invest substantial time and attention to the case, especially if combined with a track record from past class actions backed by the funder, may serve as a rough proxy for what would otherwise be ordinary due diligence for a financing arrangement.

In class actions governed by the Private Securities Litigation Reform Act, or other situations in which a court will ultimately pick a "lead plaintiff"/"lead counsel," aspiring lead counsel may, as part of the lead-counsel application process, want to reveal the availability of litigation funding as a benefit that will assure that there is sufficient financial backing to see the case through to its conclusion.  *See FJC Pocket Guide*, at 9, n.16.

There will be situations, particularly in securities or consumer class actions, where a sophisticated lawyer will work with a funder.  The existence of these relationships is required to be disclosed in some jurisdictions and would likely need to be disclosed in others in order for the funder to be paid by a Settlement Administrator.  For example, class action funding arrangements are required to be disclosed by Standing Order of all judges in the United States District Court for the Northern District of California.  *See* Standing Order, ¶ 19 ("In any proposed class, collective, or representative action, the required disclosure includes any person or entity that is funding the prosecution of any

claim or counterclaim."). Other jurisdictions may follow with similar requirements.[3] Additionally, at a later point in the class action context – settlement approval and implementation – the most likely source for payments to the funder will be first, a repayment of expenses, and second, from the sums awarded the lawyer. Awarding sums from the recovery earmarked for the class, particularly in a common fund situation, may require greater disclosure and review by the court and perhaps notice to absent class members.

There is at least one international case of a court-approved arrangement for payment to a funder from funds that would otherwise be available to the class, rather than from attorneys' fees. The Federal Court of Australia has certified a shareholder class and approved the litigation funder being paid on a percentage basis from a common fund, subject to court oversight. *Money Max Int Pty Ltd (Trustee) v. QBE Ins. Group*, FCAFC 148 (October 26, 2016).

### B. Client-Funder Arrangements

Under a typical client-funder arrangement as described by the New York City Bar Association, "the funder agrees directly with the lawyer's client to provide funding for a specific matter and the client agrees to make future payments if the client prevails." *NYC Bar Op 2018-5.* In effect, the client rather than the lawyer is the party agreeing to make the payment, and the payment does not affect the amount of the lawyer's fee.

Consistent with the concept of an "investment" (as opposed to a loan), the arrangement provides funding on a non-recourse basis. The funder provides money for prosecuting the lawsuit. The client agrees to compensate the funder from the recovery in the lawsuit, but only from the recovery: no recovery, no return for the funder. Typically, the return to the funder will be a stated percentage of what the client recovers, and is *not* calculated based on the amount advanced.

### 1. Living Support for Unsophisticated Litigants

Early client litigation funding often involved amounts paid to fund the living expenses of a personal injury plaintiff. Some arrangements were structured as loans while others were structured as investments. The expectation was that the money would be used to provide support for the plaintiff's living and other expenses, and not necessarily to support the funding of the lawsuit itself. *See 20/20 Report.* Early ABA Formal Opinions addressed this situation, such as ABA Formal Opinion 484 (focusing upon advances from lawyer to or on behalf of client).

### 2. Investing in Commercial Litigation: Sophisticated Client, Single Big Case

---

[3] Because the disclosure requirement in the Northern District of California Standing Order excited considerable legal press and commentary when announced on January 22, 2017, experience with the disclosure requirement of the Standing Order may result in consideration of similar local practices or eventually changes to mandatory disclosure requirements.

**111A**

The more recent emphasis on litigation funding, however, has involved funders investing in expensive lawsuits that have a possibility of large awards.  These single big lawsuits with a sophisticated client implicate different concerns from the early "living expense" model of litigation funding.  The party negotiating with both the lawyer and the funder may very well be a well-funded, sophisticated, repeat litigant.   In these circumstances, the litigation funding is being designated to fund the lawsuit directly as opposed to providing ongoing living expenses for the client.

### 3.      Portfolio Funding

A recent development is portfolio funding. This funding can be provided to a client involved in multiple actions, either as a plaintiff or defendant, or to lawyers handling multiple actions involving different clients.  The portfolio funding can be structured either as a direct lawyer-funder arrangement, or as a client-funder arrangement.  When the funding is to the law firm for multiple cases, the firm may need to disclose the funding to the different clients.  Related but slightly different disclosure issues may be required when more than one type of case is covered by the portfolio funding.

"Portfolio funding is gaining prominence as an alternative to financing on a case-by-case basis and is an approach that many funders now actively promote.  A portfolio arrangement can be structured in many ways; [one major type is] finance structured around a law firm, or department within a law firm, where the claim holders may be various clients of the firm . . . ." *ICCA Report*.

"Structuring finance around multiple claims . . . usually involves some form of cross-collateralization, meaning that the funder's return is dependent upon the overall net financial performance of the portfolio as opposed to the outcome of each particular claim.  This type of structure may enable the entity (*e.g.*, the law firm . . .) to secure third-party funding more quickly, on pre-arranged terms, and, depending on the structure, the ability to benefit from the overall success of the portfolio.  Additionally, there may also be economic benefits to this approach – if the funder's risk is spread across multiple claims, this should in turn dictate a lower cost of capital for the funded party (although this does not always materialize in practice)." *Id.*

"A law firm portfolio may be structurally similar [to a corporate claim holder's portfolio], where the finance is provided to support a law firm's contingency fee portfolio, with the funder's return pegged to the law firm's success.  Again, such a model potentially allows for the law firm to draw and deploy capital more flexibly than a single case funding scenario, as well as enabling, for example, fee overruns on one case to be offset by another case that is operating below budget.  In this model, the funder may have no direct contractual relationship with the law firm's clients, as the portfolio funding agreement is only between the law firm and the funder." *Id.*

### 4.      Not Motivated by Profit:  Cause-Based Funding

Some litigation funding is based upon interests of the funder other than profit.  For example, a funder may wish to advance social, political, or other policy interests and seek

to fund litigation brought by others to do so.  The Times Up Legal Defense Fund is a recent example.  This funding can take the form of grants or donations with no expectation of recovery or recoverable grants where repayment occurs only when fees and costs are recovered.  Whether the goals of the litigation align with the funder's charitable purposes will be of greater significance than the prospect of repayment.

### 5.    Revenge Funding

A funder may also be motivated by purely personal grudges or other idiosyncratic motives.  This "revenge funding" occurs when the funder advances sums to a litigant to sue someone to further the personal (sometimes undisclosed) objectives of the funder.  The subject matter of the dispute is less important than the ability to extract revenge or punishment upon the defendant.

As one commentator noted, "[r]evenge litigation funding utilizes third-party litigation funding to weaponize torts against a specific target; using the legal system to carry out a vendetta versus an interest in the return on investment." *Eat Your Vitamins.* While the recent litigation against Gawker received attention for this particular form of funding by one wealthy donor, there is little reason to believe that this will be a growing practice.

"In *In re Gilman's Administratrix*, 167 N.E. 437 (N.Y. 1929), Judge Cardozo said that 'maintenance inspired by charity or benevolence' could be legal but not 'maintenance for spite or envy or the promise or hope of gain.'" *20/20 Report.*  In these circumstances, the lawyer should examine whether the motives of the funder will affect the legality and enforceability of the arrangement.

### 6.    Respondent-/Defendant-Side Funding

In some situations, a party defending against litigation may receive outside funding as well.  Putting aside the instance of counterclaims, the reasons for defendant-side funding will generally involve situations in which a realistic economic exit point, as well as pricing based upon that exit point, can be determined.  These arrangements are individually negotiated and can vary widely.

While defendant-side funding does not seem to be garnering the same attention as other forms of litigation funding, the concept has existed for over a decade and major funders have stated that they engage in it.  In broad strokes, "the two parties (the defendant and the financier) agree on a definition of a 'successful' outcome, often settlement below a certain dollar threshold.  The financier then commits a set amount of money toward the cost of defense, to indemnify the counterparty for a settlement or judgment above a set threshold, or both.  The parties also agree on an investment return that the financier will receive in the event of a successful outcome.  The contract may also specify exactly how the defendant will pay the investment return to the financier—such as through a lump sum after resolution of the litigation or via periodic payments."  Emily Samra, *"The Business of Defense: Defense-Side Litigation Financing,"* 83 University of Chicago L. Rev. 2299, at 2305 (2016), *see also* pp. 2328-40.  As recently as 2016, the

"most fertile segment of the defense-side litigation-financing market [was identified as] noninsured business disputes."  *Id.* at 2313.  The market remains relatively untapped.  It has grown as a concept since 2011.[4]

### 7.   Third-Party Funding in International Arbitration

Many of the suggested best practices for litigation funding have been developed in the context of international arbitration.   In 2018, the International Council for Commercial Arbitration issued an important report on Third-Party Funding in International Arbitration (the "ICCA Report"), which serves as a primary document, arising out of many years of experience with funding arrangements for arbitration.

Some aspects of international arbitration will not be present in United States-based court proceedings.   For example, not unusual in international arbitration for a party seeking expensive discovery to be required to demonstrate an ability to pay the other side's costs, including a portion of its legal fees, in the event the claim is unsuccessful. Here, the presence of a funder can be particularly meaningful.  Under the United States-based "American rule," in which each party pays its own fees regardless of who prevails, however, these factors are less significant.

## IV.   BEST PRACTICES

Even though there are multiple forms of third-party litigation funding and meaningful distinctions among them, some best practices will apply across the board. Here are a few of those common elements:

The arrangement should be spelled out in writing.

The writing should make clear the non-recourse nature of the investment the funder is making in the claim; how the funder will be compensated; and

---

[4] "Information obtained by the [ABA] Commission Working Group shows that, [in 2011], investors in ALF are primarily financing the claimant, though defense side financing is also possible.  Funding on the defense side obviously does not involve taking a percentage interest in the claim, but often does involve the ALF supplier taking all or a percentage interest in the liability facing the defendant. . . . ALF transactions between large law firms and defendants are generally negotiated individually between the parties, with the method of calculating the supplier's payment being one of the most important terms in the contract."  Ralph Lindeman, "Third-Party Investors Offer New Funding Source for Major Commercial Lawsuits," (BNA: Daily Report for Executives, Vol. 0, No. 42 March 5, 2010) (posted March 10, 2010) ("Although most investments of third-party funders to date have been on the plaintiff's side, company executives do not rule out targeted investments on the defense side.  'It's not a matter of favoring plaintiffs over defendants,' said [Selvyn] Seidel [then-chairman of Burford Capital Ltd.] 'It's a matter of favoring good claims and good defenses over bad claims and bad defenses.'  [Richard] Fields at Juridica [Capital Management Limited] agreed, saying, 'Although we haven't closed a deal on the defense side yet, we are going to be playing in that arena as well.'"); *20/20 Report* (citing Comments of Burford Group to the Am. Bar Ass'n Working Group on Alternative Litig. Fin. 4 (Feb. 15, 2011) ("Burford is willing to finance plaintiffs and defendants with equanimity."); Comments of Juridica Capital Mgmt. Ltd. to the Am. Bar Ass'n Working Group on Alternative Litig. Fin. 2 (Feb. 17, 2011) ("To date we have been involved mainly in claims by plaintiffs in major commercial litigation but we – and we understand at least one of our peers – are working on products for defendants as well.")).

who is responsible for paying the funder, from what source (*e.g.*, the recovery after trial or settlement) and when (*e.g.*, time period after receipt of judgment or settlement funds).

The arrangement should be structured so that the client retains control of the litigation, and not the funder (or lawyer, if the lawyer is receiving the funding).

Lawyers should be cautious in making case-related reports or predictions.

These Best Practices, as well as others that are common across all types of litigation funding, are set out below.  They are supplemented in sections that follow with additional comments when appropriate, for particular types of litigation funding that require special considerations.

A. <u>Disclosure</u>

The careful lawyer should assume that the litigation funding arrangement may well be examined by a court or the other party at some point in litigation.[5]  Disclosure may be required in many contexts.  It could be required (1) in jurisdictions that do not find such arrangements protected by work product or attorney-client privilege or those that require disclosure by court rule or discovery order, (2) in a subsequent dispute regarding payment, or (3) in a jurisdiction in which loans to clients are prohibited.

Disclosure is addressed by ABA Formal Opinion 484, which advises that a lawyer who is willing to allow a client to finance the lawyer's fee must explain the arrangement to the client to the extent reasonably necessary to permit the client to make informed decisions about the funding.  Depending on the facts, this may include explaining:

(1)     the lawyer's relationship with the finance company or broker, including any fees paid by the lawyer to the company or broker, the payments received by the lawyer, and whether the company or broker is also a client of the lawyer;

(2)     how the lawyer's fee will be paid by the finance company or bank where the finance company or bank disburses funds directly to the lawyer, or how the client is expected to pay the lawyer's fee where the finance company or bank disburses the loan funds to the client;

---

[5]  As noted above, these Best Practices do not take a position on whether disclosure to a court or adversary will or should take place.  A careful lawyer will assure that the written undertakings accurately reflect that the client retains control of the litigation, that disclosures to the funder are limited so as not to create risks of waiver of attorney-client privilege or work product, and that the attorney retains and protects his or her ability to exercise independent professional judgment.  Lawyers should examine relevant ethics and court rules or precedents in their jurisdiction – and, if different, where the case is pending – regarding the need for and the contents of disclosure.

(3)     that the finance company will inform the lawyer when it makes a loan to the client and disburses funds to the client;

(4)     the costs and benefits of the transaction to the client;

(5)     the terms of the arrangement between the finance company or broker and the client as known or understood by the lawyer;

(6)     alternative payment options for the client and other funding sources or arrangements that may be of equal or superior value/risk profile to the client;

(7)     any payment terms that the lawyer intends to impose if the finance company disburses the loan proceeds to the client rather than to the lawyer;

(8)     whether the lawyer will charge a higher fee than he or she would charge otherwise because of the financing arrangement, for example to recoup any financing or other fee the lawyer must pay to the finance company or broker;

(9)     the lawyer's obligation to maintain the confidentiality of client information with respect to the finance company, broker, or bank;

(10)    that paying the lawyer through fee financing may affect the rights and remedies the client might have to obtain the repayment or return of those funds or the forgiveness or reduction of the client's debt in a dispute arising out of the lawyer's performance; and

(11)    any other factors that the lawyer knows or reasonably should know to be material to the financing of the representation.

The lawyer should advise the client that the client is to remain in charge of the lawsuit, as well as explain and take steps to assure that the financing entity will not direct or regulate the lawyer's professional judgment.  *See ABA Formal Opinion 484*.

If the lawyer has or acquires any direct or indirect ownership or other profit interest in the financing company, the lawyer would be entering into a business relationship with the client by providing funding; this requires the lawyer to (1) make appropriate disclosure, (2) provide fair and reasonable terms, fully disclosed and explained; (3) advise the client about seeking independent legal advice as to whether to enter into the proposed funding; and (4) obtain informed written consent.  *Id.*

## B.    Documentation and Structure

General:  The funding agreement should be drafted to assure that (a) the client retains control of the litigation (including, for example, decisions as to whether to settle or discontinue the litigation as opposed to proceeding to trial or verdict), and (b) that the

lawyer retains independent professional judgment.  Lawyers advising clients on litigation funding should be careful about arrangements that appear to give a majority interest in lawsuit to the funder because this may give rise to an argument that the funder has assumed control of the lawsuit, a role that belongs to the client.  While there may be cases in which more than a majority of the recovery goes to the funder for a variety of reasons, control of key litigation decisions, including with respect to settlement, should remain with the client in all circumstances.

The non-recourse nature of the agreement should be clearly set forth.  Recourse can take many forms, including liability for a variety of wrongs caused the funder.  Merger and integration clauses as well as robust waiver provisions are a must.

Basic Funding Agreement Terms:  Funding agreements should be in writing, and their terms should be clear, unequivocal, and reflect the intentions of the parties (*i.e.*, the client, funder, lawyer, and any other relevant persons).  Funding agreements also should state the amount of funding to be provided, the amount or method of calculating the return to the third-party funder, and how and when the proceeds of the party's recovery are to be distributed among the parties.  Funding agreements should provide a fair, transparent, and independent dispute resolution process.  Funding agreements also should include a recommendation that a party obtain independent legal advice as to whether to enter into the proposed funding.  There should also be a confidentiality obligation of the funder that survives termination of the agreement.

Parties to the Agreement:  In client-funder financing, the third-party funder and the party should be the sole parties to the funding agreement in order to avoid any potential attorney conflicts of interest, should the party and the funder disagree on a material issue during the course of the litigation.  Many non-recourse finance agreements ask the attorney to promise the funder that the attorney will notify the funder when the case is resolved.  This duty can be established either by the lawyer making a side agreement with the funder or the funder conditioning the funding on the client issuing irrevocable instructions to the lawyer.

No Representations:  Lawyers should obtain written affirmation from the funder that no advice, opinions or representations have been made by the client or lawyer and that the funder disclaims the existence or materiality of, or any reliance by it upon, any such advice, opinions, or representations.  Providing advice to the funder about the merits of the lawsuit may not only raise questions about waiver of attorney-client privilege, but could also expose the lawyer to claims that the lawyer will need to supplement or alter that advice as the litigation proceeds and the facts develop.

The goal of this provision is to negate any fraud or fraud like claims, as well as any reliance.  In particular:

(1)     the funding agreement should state that no advice as to the underlying claims has been or will be provided to the funder and no one at the law firm or client has any authority to offer such advice; and

(2) the lawyer should obtain acknowledgement from the funder that no opinions have been offered and none were sought on the underlying lawsuit, and none will be required by the funder during the case.

<u>Termination of Agreement or Withdrawal</u>:  Provisions for termination and withdrawal are some of the most important issues to consider in any funding agreement. In considering such terms, the parties should clearly address:

(1) when either or both parties can terminate the agreement and on what bases, including with respect to (i) funding already provided, (ii) any future funding, and (iii) returns due to the third-party funder;

(2) if there is a termination, what is the impact of that termination on (i) funding already provided, (ii) any future funding, and (iii) returns due to the third-party funder;

(3) whether and when notice of intent to terminate or withdraw must be provided and whether it must be in writing;

(4) whether there is a point in the proceedings after which termination of the agreement is precluded;

(5) how any amendments or modification of the terms of the agreement will be handled;

(6) what funding limits are set in advance and how and when those limits may be re-examined (particularly as to additional expenses); and

(7) what continuing or further obligation of confidentiality is owed by the third-party funder to a party should the agreement be terminated.

<u>Transparency</u>:  A lawyer contemplating a funding arrangement should consider:

(1) whether the third-party funder is or will be audited annually by a reputable firm;

(2) whether the third-party funder will periodically provide a statement of the capital invested during the pendency of the case, the percentage of the budget consumed, and the risk, if any, that the budget may be exhausted;

(3) a clear expression in the funding agreement that only the client (and not the funder) can terminate counsel;

(4) including a provision providing that the third-party funder should provide accurate and non-misleading information, particularly regarding its financial conditions, and its intended funding commitment; and

(5)      whether and in what circumstances the third-party funder will manage a party's litigation itself or the litigation expenses of the case.[6]  This is a major red flag and should rarely, if ever, be allowed.

<u>Day-to-Day Case Management and Strategic Decisions (Party Control)</u>:   The litigation should be managed and controlled by the party and the party's counsel. Limitations on a third-party funder's involvement in, or direct or indirect control of or input into (or receipt of notice of), either day-to-day or broader litigation management and on all key issues (such as strategy and settlement) should be addressed in the funding agreement.   The funding agreement also should address the procedures, rights, and duties that apply if an unresolved dispute over management and strategy arises.   In all cases, the client and lawyer should have final say.

Similarly, lawyers may want to obtain written acknowledgement that the funder will not seek to control the litigation or the expense (other than the "reasonable and necessary" language normally attached to the expenditure of fees and expenses – and even this oversight can be problematic).

Lawyers should establish a schedule of dates or milestones when the payments will be made:  *e.g.*, one lump sum payable to an account to be drawn on as opposed to repeated requests for payment, with the requirement that payment of uncontested fees be made within a specified period of time).  (As a general matter, whatever the funder does not pay, the client must pay when due.)

The agreement should establish what notice and involvement the funder is to receive of settlement-related proposals, negotiations, and agreements.  This notice may range from no notice, to transparency on all settlement negotiations (*i.e.*, a seat at the table in mediation), to not having the funder involved in the settlement discussions in any respect.

**C.**      <u>**Professional Responsibility**</u>

The lawyer should examine the rules of professional responsibility in any relevant jurisdiction (*e.g.*, if the action is pending elsewhere other than in the State in which the lawyer is admitted), particularly as they apply to the following:[7]

- Independent Professional Judgment and Conflict of Interest.

     o    Conflict of Interest.

         i.      Material Limitation Conflicts (Model Rule 1.7(a)(2)).

---

[6]   As discussed above, as a general principle, the greater the control the funder has over the litigation, the weaker the argument becomes that disclosures to the funder are privileged or otherwise protected and, in some jurisdictions, if too much control is granted to the funder, the arrangement itself may be subject to heightened scrutiny under what remains of champerty or maintenance concerns.

[7]   This list is adapted from the 20/20 Report.

      ii.   Business transactions with Clients (Model Rule 1.8(a)).

      iii.   Financial Assistance to Clients (Model Rule 1.8(e)).

      iv.   Acquisition of an Interest in the Client's Cause of Action (Model Rule 1.8(i)).

      v.   Withdrawal and substitution of counsel (Model Rule 1.16).

  o  Interference.

      i.   Referring clients to funders.

      ii.   Effect on settlement (express contract provisions addressing who approves settlements and awareness of effect of incentives in funding arrangements upon decisions of plaintiffs, either over- or under-incentivizing settlements at particular points in the litigation in light of the fee structure).

      iii.   Fee Sharing (Model Rule 5.4(a)).

      iv.   Third Party Payment of Fees (Model Rule 1.8(f) and 5.4(c)).

- Confidentiality, Privilege and Work Product.

  o  Duty of Confidentiality (Model Rule 1.6)[8].

  o  Attorney-Client Privilege, Waiver, Common Interest exception.

  o  Work Product Doctrine.

  o  Third-Party Evaluations.

- Fees.

  o  Reasonableness (Model Rule 1.5).

  o  Passing Borrowing Costs to Clients (Model Rule 1.5).

- Competence & Communication:  advising in connection with ALF transactions.

---

[8] It is important for attorneys to "balance the disclosure of information required for assessment/due diligence and minimizing the risk of waiving privilege," keeping in mind that funders have been the target of fraudulent schemes.  *ICCA Report*; *see also* Indictment in *United States v. Hammatt*, case no. 1:19-cr-00067 (S.D.N.Y. 2019) (describing attorney who "borrowed" money from a funder based upon a falsified settlement agreement).

The lawyer must charge a reasonable fee, even if it is increased because of finance or subscription fees.  *See ABA Formal Opinion 484.*

If the lawyer accepts a flat fee, he or she must deposit the funds in an account and treat them as unearned or earned in the same way as the jurisdiction provides for the payment of flat fees generally.  The lawyer must refund any unearned fees.

The lawyer should beware of conflicts of interest (*e.g.*, is a particular financing company in the client's best interest, or just the lawyer's?).  Similarly, has the lawyer represented the finance company previously, such that it is a former client and the lawyer would need informed consent from that client?  Also, how many times has the lawyer used the particular funder or any other funders? What is the relationship between the lawyer and the funder?

## D.        Privilege and Work Product

Lawyers should explain the doctrines of attorney-client privilege and work product to the client.

In general, the lawyer may not reveal confidential information about the representation to the financing entity, without the client's informed consent.  *ABA Formal Opinion 484.*

Financing entities that are new to the industry, in particular, may need to be educated about how the attorney-client privilege works, as well as regarding issues of waiver.  The lawyer should also explain the limitations that must be imposed on the financing entity's involvement in the litigation.  For example, financing companies should not ask for any non-public documents, so that privilege is not an issue.[9]

Best Practices Regarding Privilege:[10]  A party should seek – and, if not specifically requested by the client, the lawyer should provide – legal advice regarding the doctrines of attorney-client privilege (and any other privileges that may inure), professional secrecy, work product and waiver, under the law(s) potentially applicable to funding arrangements. ABA Model Rule 8.5 addresses choice of law issues regarding the relevant rules of professional conduct.  Given the variance of treatment of attorney-client privilege in the international context, choice of law issues should be reviewed.[11]

---

[9] "Perhaps aware of the risks in having to produce the funding application, most funding companies are moving to a more bare-bones application, so if the application has to be produced, it won't be the treasure trove of information that defendants would hope for."  S. Gupta, *Litigation Funding and Product Liability Lawsuits,* submitted for Georgia's 26th Annual Products Liability Seminar, p. 4 (2018).

[10]  This section is adapted from the *ICCA Report*.  While the same "disclosure" concerns may not all be present in US-centric litigation, the ICCA Report remains a logical starting point.

[11]  Though privilege is generally "procedural," in which a court applies the rules of privilege in its own jurisdiction, Rule 44.1 allows proof of foreign law, including privilege, in federal proceedings; *see, e.g., In re Air Crash at Belle Harbor*, 241 F.R.D. 202, 204 (S.D.N.Y. 2007); *In re Rivastigmine Patent Litig.* (MDL No. 1661), 237 F.R.D. 69, 74 (S.D.N.Y. 2006).

# 111A

The strength and applicability of the attorney-client privilege and work product doctrine vary by jurisdiction (not only from state-to-state, but depending on whether the case is in federal or state court).[12]  The availability of either protection may be evidenced by, but is not necessarily dependent on, an agreement between the party and the funder that contains provisions addressing confidentiality and/or non-disclosure.[13]

The lawyer should not provide to a potential or agreed-upon funder any attorney-client or otherwise privileged materials that would risk waiver of any privilege.[14]  Some prudent steps for the lawyer would include one or more of the following:

(1)    obtain written acknowledgment from the funder that no attorney-client or otherwise privileged materials have been supplied;

(2)    only supply the funder with public documents and access to the public file (keeping detailed communications records of bates-labeled communications);

(3)    for non-public documents, examine local rules and practices regarding waiver and ensure compliance; and

(4)    offer no opinion about the underlying claims, which are often included in responses to seemingly innocuous questions, such as:

  i.    What do you think are the chances that the Judge will do x or y?

  ii.   Are you satisfied with the Court's rulings or do you have any problems with them?

  iii.  What are weaknesses in the other side's case? In your case?

  iv.   Are there documents withheld from us?

Moreover, the lawyer may not reveal confidential information about the representation to the financing entity.  *ABA Formal Opinion 484.*

---

[12] *See generally* Fed. R. Evid. 501. *Compare, e.g., Schlaeffler v. United States*, 806 F.3d 34 (2d Cir. 2015) (upholding common interest privilege) with *Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*, 27 N.Y. 3d 616 (2016) (rejecting *Schlaeffler* and denying privilege protection).

[13] *See, e.g., United States v. Homeward Residential, Inc.*, 2016 WL 1031154, at *6 (E.D. Tex. 2016) ("[A]t least one court in [the Eastern District of Texas] has held that the presence of a written nondisclosure agreement preserves work product protection.").

[14] Work product may be provided without waiver under specific conditions, depending on the jurisdiction (including whether one is in federal or state court). *See, e.g., Miller UK Ltd. v. Caterpillar, Inc.*, 17 F. Supp. 3d 711, 735-36 (N.D. Ill. 2014) ("While disclosure of a document to a third party waives attorney-client privilege unless the disclosure is necessary to further the goal of enabling the client to seek informed legal assistance, the same is not necessarily true of documents protected by the work product doctrine."); *United States v. Homeward Residential, Inc.*, 2016 WL 1031154, at *5 (E.D. Tex. 2016) ("Disclosure of work product waives protection 'only if work-product is given to adversaries or treated in a manner that substantially increases the likelihood that an adversary will come into possession of the material.'").

## V.  **ADDITIONAL CONSIDERATIONS FOR SPECIAL TYPES OF FUNDING**

### A.  **Funding for Unsophisticated Litigants**

Choice of law considerations, with or without a choice of law provision in the agreement, may determine whether the type of financing is permitted at all.  For example, in *Maslowski v. Prospect Funding Partners LLC, et al*., 2019 Minn. App. Unpub. LEXIS 644, 2019 WL 3000747, No. A18-1906 (Minn. Ct. App. July 8, 2019), the court determined that an agreement to fund a personal injury lawsuit violated Minnesota law against champerty, even though the agreement provided for the application of New York law, which has a more narrow definition of champerty.  The court found Minnesota law to be applicable since all relevant parties and events were based in Minnesota, and concluded that the New York forum selection clause was an attempt to evade Minnesota's prohibition on champerty.  The important point is to check all potentially applicable state laws before entering into any litigation funding arrangement.

### B.  **Class Actions**

As with other types of litigation funding, disclosure, documentation, and privilege should be closely examined here.  An awareness that the litigation funding agreement may be disclosed at some point, assuring client control (rather than funder control) throughout, and guaranteeing lawyer independence will be paramount.  In the class action context, the funding agreement may have to be disclosed at the outset under a local court rule or standing order,[15] in connection with approving payment in the context of a class settlement or recovery, or simply by a court ruling on discovery requests.

It would be prudent for the lawyers to disclose certain basics even to supposedly sophisticated clients or in the context of class counsel appointment.  The lawyer would do well to assume that the litigation funding arrangement will, at some point in the litigation, be examined by a court or an opposing party.[16]  And in the event of a class action reaching a settlement, unless the entirety of the funds going to the litigation funder are to be taken from the attorney's fees, court disclosure and approval of the payment to the funder may be required in the class settlement approval process.  In addition, where a court will ultimately pick a lead plaintiff or lead counsel, lead counsel may wish to reveal

---

[15] *E.g.*, Standing Order for all Judges of the Northern District of California, Contents of the Joint Case Management Statement (adopted January 23, 2017), paragraph 19.

[16]  *See, e.g.*, *Gbarabe v. Chevron Corp.*, 2016 WL 4154849 (N.D. Cal. 2016) (finding that "the litigation funding agreement is relevant to the adequacy determination [of Rule 23 of the Federal Rules of Civil Procedure] and should be produced to defendant").  *But see Kaplan v. S.A.C. Capital Advisors, L.P.*, 2015 WL 5730101 (S.D.N.Y. 2015) (finding that "the defendants did not show that the requested [litigation funding-related] documents are relevant to any party's claim or defense").  These Best Practices do not take a position on whether disclosure should be required.  But, a careful lawyer will assure that the written agreement reflects that the client retains control, disclosures to the funder are limited so as not to waive attorney-client privilege or work product, and the attorney protects his or her ability to exercise independent professional judgment.  Lawyers should examine relevant ethics and court rules or precedents regarding the need for and the contents of disclosure.

the presence of litigation funding as a benefit to the class by assuring sufficient financial backing.

ABA Formal Opinion 484, while developed in a different context, provides guidance here as well.  Clients, even clients who seek to be class representatives, may well benefit from receiving explanations that address the possible availability, terms, and costs/benefits of litigation funding.

Particularly in the class action context, a lawyer responsible to putative class members must assure that the financing entity will not direct or regulate the lawyer's professional judgment.  *ABA Formal Opinion 484*.

The lawyer should consider whether a third-party funder and a party (whether the putative class representative or the class itself following court approval) should be the sole parties to the funding agreement to mitigate against the likelihood of potential attorney conflicts of interest should the party and the funder disagree on a material issue. Many non-recourse finance agreements ask the attorney to notify the funder when the case is resolved.

While the funder should not have a majority interest in the lawsuit, in a class action context the funder may receive more than the class representative or any class member if the case is successful.  To anticipate an attack based upon the identity of the real party in interest, care should be taken to assure that the funder does not have the ability to exercise influence over decisions of the putative representative and that, as with any class action, the attorney keeps the interests of the putative class paramount.

C.    **Portfolio Funding**

Where the lawyer has a number of cases funded by the same funder, the fee-splitting concerns raised by New York City Bar Opinion 2018-5 (or other relevant ethics authorities) should be examined and addressed.

D.    **Funding Not Motivated by Profit**

Although the main goal in this type of litigation funding is not a financial recovery, many of the same topics should be addressed in the written funding agreement.  As with other types of litigation funding, lawyers should disclose certain basics to both individual and organizational clients.  The lawyer would do well to assume that the litigation funding arrangement may be examined by a court or the other party in litigation.  In addition to the regular arguments for and against disclosure, there may be unique First Amendment protections that could come into play in determining the need for and scope of disclosure.[17]

---

[17] *National Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 428–29 (1963) (holding that the litigation-funding activities of the NAACP "are modes of expression and association protected by the First and Fourteenth Amendments, because "[i]n the context of NAACP objectives, litigation is not a technique of resolving private differences; it is a means for achieving the lawful objectives

### E.        Revenge Litigation Funding

This category is set out separately to acknowledge that this type of funding exists. This does not seem to be a statistically significant practice, but it did receive much early interest due to the anecdotal argument that the plaintiff in this type of arrangement may well abandon decision-making to the funder (who generally has a personal or institutional interest, rather than an "investment" or "profit" motive, for providing the funding to support the litigation).   In any event, the same type of disclosure, documentation, and privilege concerns are present.

### F.        Respondent/Defendant Side Funding

The same disclosure, documentation, and privilege considerations are relevant in respondent/defendant-side funding as in plaintiff-side funding.   The documentation should also set forth the amount of funding to be supplied, when it will be supplied, and how and when the funder may receive a recovery.   The main issue for defendant-side funding is establishing the metrics that will trigger the payment to the funder.   In a typical defendant-side funding scenario, a case will be valued (*e.g.*, at $10 million) and the funder will receive a portion of all "savings" realized if the case settles or resolves for less than that (*e.g.*, if the case resolved at $4 million, the funder might receive 50% of the "savings," or $3 million).   In these scenarios, defense lawyers with alternative fee arrangements may also receive less of a "cut" of the "savings," which drives home the need for transparency. Other models exist.[18]   Evaluation of both the "value" of the case as well as analysis of the likelihood of recovery below that estimate are critical to the inquiry.   Because good analytical models are still being developed, defendant-side funding depends instead on less scientific anecdotal evaluations and judgments on cases, which may have inhibited its widespread use.   However, there are litigation funders focused on this segment of the market[19] and defense-side funding has received scholarly support. [20]

### G.        Third-Party Funding in International Arbitration

"The arbitration community should strive to find a way to balance the increasing business need for innovative approaches to the financing of legal matters while protecting

---

of equality of treatment by all government").  *See also, e.g.*, *United States v. Homeward Residential Inc.*, 2016 WL 1031154 (E.D. Tex. Mar. 15, 2016); *Matthews v. City of Maitland*, 923 So. 2d 591 (Fla. Dist. Ct. App. 2006) ("The compelled disclosure of the names of citizens exercising their right to participate in the democratic process would create a chilling effect on their rights to organize and associate. . . . [D]isclosure of contributors' identity would subject them to possible intimidation and coercion."); *Estate of McPherson ex rel. Liebreich v. Church of Scientology Flag Service Organization, Inc.*, 815 So.2d 678 (Fla. 2d DCA 2002) (finding that the identity of financial contributors was not information necessary or relevant to the plaintiffs' claims; rather, it was sought to chill future funding).

[18]  *See, e.g.,* http://disputeresolutionblog.practicallaw.com/litigation-funding-and-insurance-for-defendants-a-lesser-trodden-path/.

[19]  *See, e.g.,* https://abovethelaw.com/2017/03/litigation-finance-for-defendants/; https://www.law360. com/ articles/429993/litigation-finance-co-launches-with-defense-side-focus.

[20]  Samra, *The Business of Defense: Defense-Side Litigation Financing,* 83 Univ. Chicago L. Rev. 2299 (2016) (available at: https://chicagounbound.uchicago.edu/cgi/viewcontent.cgi?  article=5980& context =uclrev).

the integrity of the arbitral process and the ultimate enforceability of awards." *ICCA Report*, at 17.

Particularly in international arbitration, due to a "loser pays" history and tradition, litigation funding may need to be disclosed to assure that litigation expenses can, in fact, be covered. Counsel for a party seeking funding should ensure that a robust non-disclosure agreement ("NDA") is entered into with a funder before any substantive discussions to protect against the disclosure of confidential communications.

Best Practices Regarding Privilege: A party should seek legal advice regarding the doctrines of privilege, professional secrecy, work product, and waiver, under the law applicable to funding arrangements. While research regarding specific tribunals is warranted, international arbitral tribunals can be expected to treat as privileged and not order production of any information that (1) is determined to be subject to a privilege under either national law or international arbitration standards, and (2) has been provided by a party or its counsel to a funder for the purpose of obtaining funding or supporting the funding relationship during the pendency of arbitral proceedings unless the material is otherwise relevant (including, for example, illustrating the ability and circumstances under which a funder may have guaranteed expenses in the event of an award against the claimant).

The strength and applicability of the privilege may be evidenced or increased by, but does not depend on, an existing agreement between the party and the funder that contains provisions addressing confidentiality and/or non-disclosure.

In instances when documents provided to a funder by a party or its counsel may be relevant and the presumptive privilege applicable to such documents may be deemed to have been waived, international tribunals have generally exercised caution in ordering their production, including limiting the purposes for which such documents or the information contained in such documents may be used.

## VI.   CONCLUSION

These Best Practices were developed to educate and guide lawyers as they navigate the complex and evolving area of litigation financing. By following these Best Practices, lawyers should be better positioned to represent their clients and protect against problems that may arise in these arrangements and relationships.

# REPORT

The *American Bar Association Best Practices for Third-Party Litigation Funding* ("Best Practices") is written to assist lawyers considering litigation funding – whether to provide legal fees for sophisticated, cross-border arbitration and litigation, to assist an individual plaintiff or claimant in a personal injury lawsuit or worker's compensation claim, or any other litigation or arbitration context.

In 2010, the ABA House of Delegates adopted the *Commission on Ethics 20/20 White Paper on Alternative Litigation Finance Informational Report to the House of Delegates* (the "20/20 Report"). That work predates the exponential growth in third-party litigation funding but provides an important foundation for Best Practices.

As the frequency of third-party litigation funding increased over the following ten years, the Section of Litigation Federal Practice Task Force has monitored the developments in terms of the types and variety of financing situations occurring, case law developments involving issues of disclosure of the arrangements in litigation, ethical issues, and the legality of the financing arrangements themselves. In view of these developments, the Task Force determined it was now time to expand upon the fine work set forth in the 20/20 Report.

The accompanying Best Practices, incorporated herein by reference, are intended to be a guide for lawyers who have no prior experience with third-party funding as well as for experienced practitioners who have utilized the services of funders on many occasions. The Best Practices include making sure the arrangement is set forth in detail in writing, includes the non-recourse nature of the financing, insures that the client retains control of the case and protects the attorney-client relationship. They explain the many different circumstances in which funding has now occurred, and cover such issues as properly documenting the arrangements, regardless of whether the funding is to the client or to counsel, properly disclosing the arrangements to the client, and ensuring that the client continues to be the master of the litigation without improper intrusion by the third-party funder.

Courts currently are of differing views on whether the fact of third-party funding and the details need to be disclosed to the other side or are proper issues for discovery. Best Practices identifies these issues but does not take a position on whether such disclosure should occur. Instead, Best Practices advises the careful lawyer to approach third-party funding on the assumption that there is a possibility that the arrangement will at some point be subject to scrutiny by the courts, and to be guided accordingly in negotiating the arrangement and conducting the litigation or arbitration.

Respectfully submitted,

Barbara J. Dawson
Chair, Section of Litigation
August 2020

Error!

**111A**

## <u>GENERAL INFORMATION FORM</u>

Submitting Entity:  Section of Litigation.

Submitted By:  Barbara J. Dawson, Section of Litigation Chair.

1.    <u>Summary of the Resolution(s)</u>.  The Resolution adopts the *American Bar Association Best Practices for Third-Party Litigation Funding*  The Best Practices include making sure the arrangement is set forth in detail in writing, includes the non-recourse nature of the financing, insures that the client retains control of the case and protects the attorney-client relationship.

2.    <u>Approval by Submitting Entity</u>.   On January 18, 2020, the Section of Litigation Council voted to submit the Resolution to the ABA House of Delegates.

3.    <u>Has this or a similar resolution been submitted to the House or Board previously</u>? No.

4.    <u>What existing Association policies are relevant to this Resolution and how would they be affected by its adoption</u>? In connection with the work of the Ethics 20/20 Commission in 2012 the Association adopted a White Paper on Alternative Litigation Finance presented as an "Informational Report to the House of Delegates" authored by the Association's Commission on Ethics 20/20.   The present Resolution and accompanying Best Practices paper update and expand upon the work of the Commission on Ethics 20/20 in light of ongoing developments.

5.    <u>If this is a late report, what urgency exists which requires action at this meeting of the House</u>?  N/A.

6.    <u>Status of Legislation</u>.  (If applicable)  N/A.

7.    <u>Brief explanation regarding plans for implementation of the policy, if adopted by the House of Delegates</u>.  Publication of the Best Practices by the Section of Litigation and other co-sponsoring organizations.

8.    <u>Cost to the Association</u>.  (Both direct and indirect costs)  None.

9.    <u>Disclosure of Interest</u>.  (If applicable)  None.

10.    <u>Referrals</u>.

        International Law Section (Co-sponsor)
        Business Law Section
        Dispute Resolution Section
        Judicial Division
        Tort Trial and Insurance Practice Section
        Standing Committee on Ethics and Professional Responsibility

2

Standing Committee on Lawyers' Professional Liability
Young Lawyers Division

11.  <u>Name and Contact Information</u>.  (Prior to the Meeting.)  Please include name, telephone number and e-mail address.  *Be* aware *that this information will be available to anyone who views the* House *of Delegates agenda online*.

Delegate Dennis J. Drasco, 973-228-6770, ddrasco@lumlaw.com
Delegate Judith Miller, 301-656-4157, judith.miller3@gmail.com

12.  <u>Name and Contact Information</u>. (Who will present the Resolution with Report to the House?)  Please include best contact information to use when on-site at the meeting. *Be aware that this information will be available to anyone who views the House of Delegates agenda online*.

Delegate Dennis J. Drasco, 973-228-6770, ddrasco@lumlaw.com
Delegate Judith Miller, 301-656-4157, judith.miller3@gmail.com

**111A**

## <u>EXECUTIVE SUMMARY</u>

1.    <u>Summary of the Resolution</u>.

The *American Bar Association Best Practices for Third-Party Litigation Funding* surveys the types of alternative litigation funding and proposes best practices to be consulted and factors to be considered by attorneys seeking to explore or utilize litigation funding in dynamic regulatory, judicial, and arbitral environments.

2.    <u>Summary of the issue that the resolution addresses</u>.

Rules applicable to alternative methods of litigation financing are rapidly changing across multiple jurisdictions and in arbitral forums.  The Resolution notes areas to be considered by attorneys considering litigation funding, including best practices to avoid ethical pitfalls, protect information otherwise covered by the attorney-client privilege and work product doctrine, and otherwise maintain client confidences.

3.    <u>Please explain how the proposed policy position will address the issue</u>.

The proposed Best Practices summary surveys multiple jurisdictions and secondary materials and provides approaches to aid lawyers who have not yet participated in litigation funding.

4.    <u>Summary of any minority views or opposition internal and/or external to the ABA which have been identified</u>.

None known at present.